Filed 11/7/13  Certified for publication 12/3/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>ANDRE JACKSON,<br><br>　　　Defendant and Appellant. | B241930<br><br>(Los Angeles County Super. Ct.<br> No. YA071275) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.

_____

Marie Jackson (Marie)[1] was found dead in the trunk of her car in 1994.[2]  Her husband, defendant and appellant Andre Jackson, was convicted in 2012 of first degree murder and sentenced to 25 years to life in state prison.  The only substantive issue[3] on appeal is whether the trial court erred in overruling objections to expert testimony of a former agent of the Federal Bureau of Investigation (FBI), explaining his assessment of various aspects of the murder.  We hold the trial court did not err in admitting the expert testimony, modify the judgment to award 225 days of conduct credits, and otherwise affirm.

## FACTS[4]

### A.  Prosecution Evidence

#### 1.  *Discovery of Marie's Car and Body*

Marie's body was recovered from the trunk of her impounded Saab automobile on November 15.  Defendant had reported Marie missing on November 12.  Police were lead to Marie's car by Timothy Cunniff, a citizen who received a missing persons flyer from defendant at Dockweiler Beach.  Cunniff saw the car described in the flyer shortly thereafter.  He was surprised defendant had not seen the car, because there

---

[1]  For purposes of clarity, we refer to multiple parties in the case by their first names because of a common surname.

[2]  All dates are in 1994, unless otherwise indicated.

[3]  The only other issue involves the amount of custody credits, an issue the Attorney General does not dispute.

[4]  Because the sufficiency of the evidence to support the conviction is not at issue, we limit the facts to the general circumstances of Marie's murder as relevant to the admissibility of the FBI agent's opinion testimony.

were no other cars in the area.  The Saab was locked and the battery had been removed.  The Saab could only be locked from the outside with keys, but no keys were located.

Marie was found wearing grey stretch pants, a purple nylon jacket, white tennis shoes, and a bra.  She had on one earring and a wedding band.  Forensic evidence was collected, including a blood drop from the hood of the Saab and scraping from under Marie's fingernails.

### 2. *Marie's Disappearance*

Marie and defendant married in March.  They lived in a secure condominium complex in Inglewood with their son Marquis, Marie's son Marcus (from a previous relationship), and defendant's children Andrea and Andre, Jr. (also from a previous relationship).  In October, a police officer was dispatched on a domestic violence call to the home, but no arrests were made and no report was written.  Marie told friends on November 10 that she was thinking of ending her marriage to defendant.

On November 11, the day of her disappearance, Marie went shopping with a close friend, Jean Jones Apfel, along with Marie's sons Marcus and Marquis.  She was not wearing the same clothes she wore at the time her body was recovered.

Andre, Jr., had a football game on the night of Friday, November 11, which defendant attended.  Andrea was at her grandmother's house that night.  Marie was last seen by Marcus at home before he fell asleep.  When he awoke, Marcus discovered that Marquis was crying and Marie was not at home.  Marie had never left them home alone in the past.  Marcus placed a call for help, explaining they had been left alone.  Defendant called Marcus to ask of Marie's whereabouts.

Defendant reported Marie as missing on Saturday, November 12.  Defendant explained to police that he had returned home the prior evening, found that Marie had been drinking, and he left home after arguing with her.  When he came home later that night, Marie and her Saab were gone.  Defendant told an officer he contacted family

3

and friends, looking for Marie, before calling the police. He cut short the interview with the officer, stating he had a previous engagement, which struck the officer as odd under the circumstances.

Defendant went to the home of Jean Jones and Raymond Apfel on the night of Marie's disappearance, asking if they had heard from her. Raymond noticed defendant had a swollen lip, which defendant said was from bumping into his son's football helmet. Jean Jones saw that defendant's hand was scratched, as did another friend that weekend.

That weekend, friends unsuccessfully checked Marie's credit cards for activity. They helped defendant prepare the missing person flyer. When told the flyers were of low quality, defendant said the information about the car was the important part. Defendant suggested the flyers be distributed at the beach and by his mother's house. The suggestion to hand out flyers at the beach seemed odd to Marie's friends, as she was not known to go to the beach. One friend asked defendant what had happened, and he said Marie had followed him to the garage and he dressed her.

Marie missed her weekly hair appointment on Saturday, which had never happened before, causing her hairstylist to call Marie at home. Defendant told her Marie had been drinking and "stormed out of the house" after an argument. Defendant cut short the call by saying he needed to attend to plumbing problems. The stylist described Marie as someone with a very strong personality who was "real concerned" with her appearance, and friends testified Marie was a meticulous dresser who would not leave home in the clothes she was wearing when her body was recovered. The stylist and other friends did not believe Marie would ever leave her children unattended. In a conversation on Sunday evening, November 13, defendant told the stylist and another friend that he had not heard from Marie but had been paged a couple of times, and he believed one page was from a club in Mexico, where he felt she had gone with an ex-boyfriend.

Marie's credit cards were found on a freeway onramp in Inglewood on November 15, less than two miles from her home. They had not been used after her disappearance.

### 3. *Autopsy and DNA Results*

The medical examiner concluded Marie died of manual strangulation. Death had occurred three to seven days before discovery of her body. She had injuries to her head, face, and neck that were consistent with resisting during a struggle. Her blood alcohol level was .12, although decomposition of the body may have elevated the result. There was no sign of sexual assault.

In 2005, the FBI analyzed the blood stain from the Saab and Marie's fingernail scrapings, both of which matched defendant's DNA profile. Defendant was a major donor of the DNA from the fingernail scrapings, an unusual result, because typically the major donor would be the person whose fingernails were sampled.

### 4. *Defendant's Conduct After Being Advised of Marie's Death*

When Detective Russell Enyeart returned to the Inglewood Police Station from the tow yard where the Saab had been impounded, he learned that defendant was waiting in the lobby. Detective Enyeart was surprised defendant was at the station, as no one had been notified about recovery of the car. In an interview with the detective, defendant said that on the night of Marie's disappearance, he left work at 5:00 p.m. and arrived home between 5:10 p.m. and 5:15 p.m. Defendant had planned to go to his son's football game with Marie but told her to stay home because she had been drinking. When he returned from the game, Marcus and Marquis were alone in the house. According to defendant, Marie was supposed to drive to his grandmother's house that evening to pick up Andrea but failed to do so.

When Detective Enyeart advised defendant that his wife's vehicle had been recovered and the body of a female was discovered in the trunk, defendant immediately fell to the floor, screaming and kicking his legs to the point of being hysterical, causing the detective to terminate the interview. Detective Enyeart had never seen a male respond in this fashion, which included a minimum of 300 notifications of victim deaths.

On November 30, defendant contacted Detective Enyeart and inquired if there was any additional information regarding the investigation. The detective informed defendant he was the primary suspect, and if defendant had any information regarding a motive or suspects in the murder of his wife, he should provide that information to be investigated and eliminate suspicion on him. Defendant said it was not his job, it was the detective's job to investigate the crime. The detective was taken aback by the comment, which he documented.

## 5. *Testimony of Mark Safarik*[5]

Safarik is the executive director of Forensic Behavioral Services International, a consulting firm that specializes in the analysis and interpretation of the dynamic interaction between offenders, victims, and locations in violent crime offenses. He has a bachelor's degree in human physiology and a master's degree in criminal justice. He has approximately 30 years of law enforcement, including 7 years with a university police department followed by various assignments as an agent for the FBI.

In 1995, Safarik joined the FBI's National Center for the Analysis of Violent Crime (the Center), "the profiling unit," working as a liaison between the FBI's Behavioral Analysis Unit and local law enforcement agencies that request analysis of a case. Safarik worked in the Center from 1995 to 2007, when he retired from the FBI. He had ongoing training with the FBI and trained and lectured to over 20,000 others.

---

[5] Based upon an agreement between the parties, Safarik was allowed to read the admissible portions of his report to the jury.

6

Safarik has been involved in empirical research and has been published in journals and textbooks, particularly in the area of sexual homicide of elderly females. He worked on or reviewed in excess of 4,000 crime scenes.

Criminal investigative analysis is a process that analyzes a violent crime scene from a behavioral and physical evidence forensic standpoint. His role is to do the analysis and interpret that information to understand what happened at a scene, and how and why it happened. He conducts what formerly was called the criminal profile but really is an unknown offender assessment. His role is not to identify the perpetrator of a crime.

In this case, he performed a crime scene assessment, that is "irrespective of who committed the crime." From an analysis of the crime and the behavior at a crime scene, he can sometimes draw specific conclusions about the crime or the motivation for the crime depending on the unique attributes of a case. The purpose of his analysis was to behaviorally and forensically assess the crime and crime scene dynamics through the interaction of the offender or offenders, Marie, and the location, in order to determine whether the crime scene had been staged, to focus on why the homicide occurred, and if an opinion could be rendered as to the offender's motive.

Safarik treated defendant as a witness in his analysis and not as a suspect, because his role was to focus on the analysis of the crime scene. Defendant provided information as a witness that was part of the timeline of the offense. In drawing conclusions from the crime scene, Safarik did not consider defendant's conduct regarding Marie's credit cards, passing out flyers in the area where her body was recovered, the scratches observed on his hands, or the presence of blood containing defendant's DNA on Marie's Saab.

Safarik's testimony reviewed the evidence he relied upon in conducting his analysis. Because no argument is made on appeal that Safarik relied on facts not contained in the evidence introduced at trial, we focus primarily on his conclusions, making only limited references to the evidence when necessary.

Among the conclusions reached by Safarik were the following:

7

—Marie was described as a very self-confident woman who would not back down from a confrontation and would not allow herself to be abused verbally or physically without fighting back if a situation threatened her with injury.

—Marie had no known enemies or ongoing problems other than marital issues. She never reported to any family members or friends that she was being followed or harassed by anyone, nor was there evidence to suggest she was involved in an extramarital affair.

—Marie was known as a loving mother, particularly in regard to her own children, Marcus and Marquis.

—Marie was very conscious of her appearance, wearing color coordinated and appropriate clothing ensembles for the activity in which she was engaged.

—Marie's townhouse was accessed through a remote controlled gate. Access to the front doors of the townhome development was blocked by a security gate and fence. A stranger would have to assume a high level of risk to access Marie within a secure townhome complex. There were many residences without security barriers in the immediate vicinity that afforded less risky access.

—Crime statistics for the area of the family residence made it unlikely, based on the location and time of the homicide, that Marie was randomly selected by an offender operating within the geographic area of his choice. She was specifically targeted by the offender because of who she was personally and what this represented to the offender.

—There was nothing observed in the dynamics of this crime to indicate that Marie placed herself into a situation in which risk to her was elevated. There was nothing to indicate that Marie intentionally abandoned eight-year-old Marcus and eight-month-old Marquis alone at night in order to go jogging on a beach some distance from her residence.

—The evidence suggests the victim was not killed in her vehicle but rather at her residence.

—Marie's body was placed inside the trunk area of her 1991 Saab by the offender. There was nothing either forensically or behaviorally to indicate that Marie was contacted by the offender while in the vehicle and subsequently killed.

—An offender elevates the risk level by engaging with the victim or the scene subsequent to committing the homicide.

—The offender drove Marie's vehicle to a small turnout on the road, locked the vehicle, and removed the battery. The Saab was left on a well travelled boulevard, directly west of the Los Angeles International Airport and adjacent to the Dockweiler Beach. These actions caused the offender to remain at the scene and significantly elevate the risk of being identified or contacted by law enforcement.

—The offender was committed to moving Marie to a different location than where she was killed and ensuring that the vehicle would not be moved or stolen. This level of commitment indicates a very mission-oriented offender who engaged in very high risk behavior to further his goals.

—Marie was killed at her home because the offender had access to her there at that time of the day, as well as the privacy to interact with her.

—The medical examiner's report indicated Marie's legs were bent forward toward the hip area. She would not have fit into the trunk area with her legs extended. Her right leg was pushed ahead of her left, in a position consistent with the offender having pushed her further into the interior of the trunk by pushing on her right buttock and leg area.

—The cause of death was listed by the medical examiner as manual strangulation. There was evidence of a single pre-death blow to the head. In order to manually strangle someone to death, a significant amount of pressure must be applied for a continuous time period, usually consisting of several minutes. During this time, the offender must contend with the victim resisting the strangling by attempting to remove the offender's hands from the neck. Many offenders initially resort to using blunt force trauma to subdue or incapacitate the victim in order to render them easier to strangle. When victims of strangulation have minimal or no blunt force injuries, it

indicates that the victim did not perceive the risk to which she was exposed until it was too late, or she did not possess the physical strength to resist.

—Manual strangulation is usually considered a personal crime, with the notable exception of serial offenders. The reason the offender resorts to manual strangulation has to do with the rapidly escalating conflict situation and the lack of immediate access to a weapon. As a result, the offender uses what he has access to, his hands and much less often his feet. A situation arises between the offender and the victim that escalates quickly from a verbal confrontation to a physical assault that ultimately ends in homicide, with little or no time to find a weapon.

—Marie went shopping with her two sons and a friend on November 11, with Marquis in the infant car seat that was always in the back of the car but had been removed from the Saab at the time it was recovered.

—Marie was not a jogger or runner and did not like the Dockweiler Beach area. There is nothing that can logically account for Marie changing her clothes into jogging attire, removing the infant car seat from the back seat of the Saab, and driving to the beach in order to go jogging while leaving her sons alone.

—Marie's Saab has an electronic locking system that allows the vehicle's front doors and hatch to be locked from the outside using a key, unless one manually overrides the system by reaching across to the driver's side, locks the door, and then exits from the passenger side after locking that door. This scenario requires specialized knowledge of the locking options for this uncommon vehicle.

—The hood of the Saab, which also has a unique opening mechanism, can only be released by pushing the inside release handle under the left dashboard. Removal of the battery from the vehicle complicates the locking of the vehicle and significantly elevates the risk to the offender. If the offender popped the hood and removed the battery, there would be no electricity available to lock the vehicle with the key from outside the driver's door. In order to lock the car with the key, one would have to make sure the hood had been popped open before exiting the vehicle and lock it from

10

the outside in order to lock both doors and the hatch, and finally, open the hood and remove the battery.

Removing the battery required the use of a 10-millimeter wrench or socket to loosen the battery terminals, since the terminal wires were not damaged. The offender either had the necessary tools to effect the removal of the battery and brought them with him to the crime scene, or knew the necessary tools were stored in the right wheel well of the car. Either scenario required knowledge specific to that particular vehicle.

—Nothing at the crime scene indicated either forensically or behaviorally that sexual assault was a motive. Marie was not sexually assaulted, and her clothing was not in disarray.

—Offenders often kill in the course of financially motivated crimes. The level of violence, the lack of ransacking and theft, and the postmortem activity engaged in by the offender are inconsistent with a motive of financial gain. The offender did not need to kill Marie in order to successfully rob her. There was nothing observed to support the hypothesis that Marie had been initially contacted at her residence by an offender intent on committing a home invasion robbery. Marcus was never contacted by an offender either securing or searching the residence, and nothing at the residence was disturbed, searched, or taken. A murder for financial gain would not explain Marie's change of clothing. Assuming Marie left the residence of her own volition and was attacked by an offender at some public location, the failure to take her vehicle, jewelry, or take and use her credit cards, later recovered on a freeway onramp in a bundle, is inconsistent with a financial gain crime.

—The movement of Marie's body to the trunk, driving the vehicle with the body to a high-visibility location, locking the car, and then removing the vehicle's battery is completely inconsistent with offender behavior in financial gain offenses.

—A thrill killing was also considered but readily dismissed because there was nothing identified that was consistent with that motive.

—A commonly identified motive in homicide is personal cause with the interpersonal conflict between two people at the root for the homicide of one of them.

The important question is why someone would elevate their risk level by remaining with a vehicle containing a dead body in a highly public place in order to take out an old, dirty battery and remove it from the scene. There is no logical reason for an offender who was a stranger to Marie to remove the infant car seat.

    —This was a homicide that resulted from interpersonal aggression between the offender and Marie, who was the primary target. The offender used a personal weapon, his hands, to effect the homicide, instead of bringing a weapon with him or obtaining one from the scene.

    —There are three primary manifestations of offender behavior at crime scenes that provide significant information: modus operandi; ritual; and staging. Staging behavior is the intentional and purposeful manipulation of the behavioral and/or forensic evidence found at the original crime scene. Staging at a crime scene is an effort by the offender to create a new or different scene and a new motive for the purpose of misdirecting the investigation. The offender attempts to overwhelm what would otherwise be a law enforcement investigator's logical deduction regarding what occurred, perceiving that without an attempt to redirect the investigation, law enforcement would quickly focus on him as a logical suspect due to a preexisting relationship with the victim, the location, or both.

    —To determine if staging has occurred, the totality of the circumstances of the crime must be considered, including every observable behavior being analyzed and reconciled with the logic of the available forensic evidence, crime scene reconstruction, and the victim. Logical crime scene attributes, both forensic and behavioral, that are noticeably absent from the scene must also be considered. It is important to consider what occurred prior to, during, and after the homicide when constructing the most probable sequence of events.

    —Safarik was of the opinion the offender engaged in extensive and unnecessary post-offense staging activity with Marie, and his primary motivation was her death. This would indicate the offender was not a stranger, but someone who had a personal relationship with Marie.

12

—There was nothing investigatively, forensically, or behaviorally to indicate Marie was aware of the threat to her life until it was too late.

—The offender attempted to stage the crime by redressing Marie in the clothes he thought would be interpreted as jogging attire, placing her into the hatchback area of her vehicle, and driving to Dockweiler Beach, where he parked the car alongside the road to make it appear as if Marie left her residence of her own volition in her vehicle to go jogging.

—By putting Marie at the beach, the offender hoped the police would conclude she was killed by an unknown offender who happened upon her by opportunity. The staged motive appears to be the weakly offered theft of the credit cards, immediate financial gain, and robbery. The credit cards and her identification were found a couple of days later, none of the cards had been used, and the offender also failed to remove any valuables from Marie's body.

—Instead of taking the car, the offender removed the battery and locked it up. He did this anticipating that police looking for the car would find it quickly and recover her body at the beach, suggesting she went there on her own.

—This crime was staged to make it appear the offender's motive for this homicide was financial gain but was poorly executed with no continuity or nexus between the actions. The offender failed to consider the appropriateness of the staged scenario and failed to follow the actions through to their logical conclusions.

—The offender acted alone; that is, there was nothing observed at the murder scene to indicate that more than one offender was involved.

### *Defense*

Defendant returned home between 5:10 and 5:20 p.m. on November 11, planning to go to his son's football game with Marie. Marie had been drinking but was not drunk. Defendant went to the football game with his son, leaving Marie lying

on the bed. Defendant went onto the field after the game, where he was bumped on the lip by his son's helmet during the celebration.

Defendant called home at around 7:30 p.m. Marcus answered the phone. Defendant asked where Marie was, but Marcus did not give him an answer. Defendant assumed Marie was in the house but was out of earshot of the call, so he said he would call back.

Defendant returned home, noticing that Marie's car was not in the garage. He was never with her in the garage that night, nor did he dress her. Marcus and Marquis were home alone. Marcus said that he last saw Marie while he was watching cartoons. Defendant tried reaching Marie by phone and pager, and then went with his children to his grandmother's house to pick up his daughter and to see if Marie was there.

Defendant contacted several people, looking for Marie. He called the police and was told he could file a missing person report the next day.

Defendant went to several friends' homes the next day. He had no cuts or bruises on his hands. He filed a missing person report with the Inglewood Police Department. Along with friends, defendant created a missing person flyer. A friend called Marie's credit card companies to see if the cards had been used.

Defendant distributed the flyers in various areas, including Dockweiler Beach, where he came in contact with Cunniff. Defendant did not drive Marie to Dockweiler Beach. He went to Dockweiler Beach because he had an appointment with a psychologist whose office was nearby. He did not urge others to post flyers at Dockweiler Beach.

Defendant went to the Inglewood Police Department with his sister Ronda on November 16, because of a lack of response to his calls. The interview ended when defendant was told Marie's body had been recovered, which resulted in defendant breaking down.

Detective Enyeart told defendant several times on November 18 that he was convinced beyond a shadow of a doubt that defendant killed Marie. The detective made the same accusation to several other persons.

Defendant went to retrieve Marie's car from impound on November 30, where he discovered the battery was missing. The blood on the hood of the car was not his.

Defendant described having a happy marriage to Marie, getting along well and engaging in sexual relations. They did not engage in a physical fight in October 1, 1994. No family meeting about a breakup ever took place. Defendant denied killing his wife or knowing who had killed her.

Friends and coworkers described defendant and Marie as having a loving relationship. Numerous witnesses expressed the opinion that defendant was nonviolent, peaceful, and honest.

Multiple witnesses, including Detective Enyeart, testified they did not observe any injuries to defendant's hand.

A forensic pathologist testified Marie was more likely to have been dead for only three or four days, rather than for five days. The failure to use a sexual assault kit and conduct a sexual assault examination resulted in a lost opportunity to collect bodily fluids and trace evidence.

Defendant's DNA expert agreed that defendant's DNA matched that of the blood found on the Saab and under Marie's fingernails. There was nothing unusual about the amount of defendant's DNA under Marie's fingernails, which could have resulted from normal activities.

Brent Turvey, an expert in the area of criminal profiling, expressed the opinion that while profiling can be useful before a suspect is identified, it should not be used where there is a known suspect. This opinion is consistent with FBI studies and protocol.

## DISCUSSION

### I

Defendant argues the trial court committed prejudicial error by admitting Safarik's testimony in violation of Evidence Code sections 800, 801, and 352, as well as his federal constitutional right to due process of law. Defendant specifically

15

complains that Safarik was allowed to express his expert opinion that Marie was not killed: by a stranger; by more than one person; during a robbery; or during a sexual assault. Safarik was further allowed to testify that Marie was killed: at her residence; by someone who was close to her; by someone who was familiar with her residence; by someone who had a personal motive to want to kill her; and by someone who wanted the police to falsely believe she went jogging at Dockweiler Beach.

## A. *Background*

The trial court held a lengthy pretrial hearing on the admissibility of Safarik's testimony. The court considered each of the 47 points contained in Safarik's report and ruled on defendant's objection to the entirety of the testimony, as well as specific objections on individual aspect of the opinion. The court overruled the general objection and the majority of the individual objections but did sustain objections relating to Marie's conduct on various grounds, including that the proposed opinion was cumulative to the testimony of lay witness in some areas and substantially more prejudicial than probative under Evidence Code section 352. An opinion relating to the disabling of the Saab was also sustained under Evidence Code section 352. The court ordered one portion of an opinion modified to delete objectionable language. The court sustained objections to Safarik's opinions that (1) "Staging in this crime was poorly executed with no continuity or nexus between the actions. The offender failed to consider Marie's victimology and the appropriateness of the staged scenario," and (2) "the offender failed to follow the actions through to their logical conclusions."

## B. *Expert Opinion, Crime Scene Analysis, and Profiling Evidence*

A witness may testify as an expert, in the form of an opinion, on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Admission of expert witness opinion

testimony is reviewed under the deferential abuse of discretion standard of review. (*People v. Fuiava* (2012) 53 Cal.4th 622, 672; *People v. Wallace* (2008) 44 Cal.4th 1032, 1062-1063.)

Crime scene analysis that is "relevant, probative, and not unduly prejudicial" is admissible in a criminal action. (*People v. Eubanks* (2011) 53 Cal.4th 110, 148; *People v. Robinson* (2005) 37 Cal.4th 592, 643-644.) Expert opinion testimony on crime scene analysis is not prohibited on the ground the jurors may have some understanding of the sequence of events as a matter of common sense, because "[e]xpert opinion on crime scene reconstruction generally is admissible" (*People v. Farnam* (2002) 28 Cal.4th 107, 162), and the jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*)). "Notwithstanding the ability of jurors to review the evidence before them and draw commonsense inferences, it may aid them to learn from a person with extensive training in crime scene analysis, who has examined not only the evidence in the particular case but has in mind his or her experience in analyzing hundreds of other cases, whether certain features that appear in all the charged crimes are comparatively rare, and therefore suggest in the expert's opinion that the crimes were committed by the same person." (*People v. Prince* (2007) 40 Cal.4th 1179, 1223 (*Prince*).)

The admissibility of profile evidence has been treated somewhat differently than crime scene analysis testimony. "A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile. (See *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084 [(*Robbie*)]; see also *People v. Smith* (2005) 35 Cal.4th 334, 357, 358 [(*Smith*)].)" (*Prince*, *supra*, 40 Cal.4th at p. 1226.) As explained in *Robbie*, *supra*, at pages 1084-1085, "[p]rofile evidence is generally inadmissible to prove guilt" because it is premised on a false assumption: "criminals act in a certain way; the defendant acted that way; therefore,

the defendant is a criminal.  Guilt flows ineluctably from the major premise through the minor one to the conclusion.  The problem is the major premise is faulty.  It implies that criminals, and only criminals, act in a given way.  In fact, certain behavior may be consistent with both innocent and illegal behavior, as the People's expert conceded here."

*Prince*, *supra*, involved the testimony of FBI Special Agent Ankrom, who had "significant" qualifications as a crime scene expert, consisting of 13 years as special agent for the FBI and 5 years in the same unit as Safarik.  (*Prince, supra,* 40 Cal.4th at p. 1220.)  "Ankrom received two years of intensive training in criminology and other academic topics and, more specifically, was trained to review comprehensive information concerning crimes and to perform a 'criminal investigative analysis' of the case material for various purposes, including to develop a profile of the perpetrator, to make recommendations on interview strategy, and to give advice regarding 'linkage' between potential serial crimes."  (*Ibid*.)  Ankrom had experience as an active agent, had reviewed information regarding hundreds of crimes, and offered expert advice to other law enforcement agencies.  (*Id*. at pp. 1220-1221.)  "[A]gents at the Center analyze crime evidence for 'linkage' by looking for common methods of operation among groups of crimes—that is, the methods used by the criminals to complete their crimes and to achieve the intended murder, rape, or other crime.  In addition to identifying common methods among a series of crimes, the agents look for signature elements—actions that were not necessarily involved in or necessary for completing the crimes, but that served as distinctive common denominators among the crimes." (*Id*. at p. 1221.)  In Ankrom's opinion, "six murders were committed by the same person" in *Prince*.  (*Ibid*.)

In upholding admission of Ankrom's testimony, the *Prince* court pointed out that Ankrom "did not evaluate *defendant's* behavior against a pattern or profile," he "did not offer an opinion that he believed defendant was the culprit, nor did he relate his findings to defendant at all," but "[i]nstead, he compared documentary evidence of the crime scenes in the present case and, based upon his observation of common marks

and his experience, concluded the crimes had been committed by a single person. In any event, profile evidence does not describe a category of always-excluded evidence; rather, the evidence ordinarily is inadmissible 'only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.' ([*Smith*]*, supra,* 35 Cal.4th at p. 357.) In sum, '[p]rofile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt.' (*Id.* at p. 358.)" (*Prince, supra,* 40 Cal.4th at p. 1226.)

## C. *Analysis*

We reject defendant's contention that the trial court committed state evidentiary error or federal constitutional error in admitting Safarik's testimony. *Prince* clearly establishes that testimony of this nature is admissible, subject to the sound discretion of the trial court. (*Prince*, *supra*, 40 Cal.4th at p. 1222.)

To the extent defendant argues Safarik's testimony was substantially more prejudicial than probative under Evidence Code section 352, the record is to the contrary. The trial court engaged in a thorough and thoughtful review of the admissibility of Safarik's testimony, admitting most of his opinions, but carefully excluding those that either did not constitute true expert opinion, were cumulative, or unduly prejudicial. Defendant makes no specific argument that any individual component of Safarik's testimony was subject to exclusion under Evidence Code section 352, and our review of the detailed record reveals no abuse of discretion.

The argument that Safarik's testimony should have been entirely excluded, as running afoul of Evidence Code section 801, is without merit. The qualifications of Safarik, and the nature of his expert testimony, cannot be materially distinguished from that of Special Agent Ankrom in *Prince, supra,* 40 Cal.4th at pages 1219-1222. The special agent in *Prince* opined that one offender had committed six offenses; Safarik testified that Marie was killed by a lone offender, who was described as

19

someone close to her, based upon the unusual circumstances of her murder. Admission of Safarik's opinion is consistent with the reasoning in *Prince*.

Defendant's contention that the jury did not need the assistance of Safarik's opinions to understand much of the evidence does not reflect the standard for admission of expert testimony. An expert opinion may assist the jury in evaluating the evidence, even when common sense would explain its meaning. (*Prince*, *supra*, 40 Cal.4th at p. 1223; *McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300.)

The trial court could reasonably conclude the jury would be assisted by Safarik's expert testimony. His analysis of all the evidence could have assisted the jury in understanding that Marie's murder was committed by a lone killer who was close to her. This case involves the unexplained disappearance of Marie from her secure home where her two young sons were under her care, and the unusual circumstances in which she was recovered from the trunk of her disabled car, in a location she did not frequent, and in clothing she would not normally wear. The significance of manual strangulation is not a matter of common knowledge and is the proper subject of expert testimony. Safarik's opinion regarding the absence of evidence of robbery or sexual assault of Marie helped to explain his conclusions regarding the staging of the body and the car. In particular, Safarik's explanation of the staging element of Marie's murder touched upon a subject well beyond the common experience of jurors.

Defendant's characterization of Safarik's testimony as inadmissible profile evidence fails. Much of Safarik's testimony consisted of crime scene analysis, an indisputably admissible class of evidence. Moreover, Safarik did not compare defendant's behavior to the characteristics of the killer. (*Prince*, *supra*, 40 Cal.4th at p. 1226 [Ankrom's testimony did not refer to the defendant or compare his conduct to the profile created].) Safarik treated defendant as a witness to certain events in the timeline of the disappearance and discovery of Marie's body in the Saab, but he specifically made no reference to, and drew no conclusions from, highly incriminating

facts such as the DNA match of defendant to the blood on the car or the scrapings from under Marie's fingernails.

Assuming portions of Safarik's testimony were considered profile evidence, it does not follow that the trial court abused its discretion by admitting the testimony. Contrary to defendant's characterization of the law, profile evidence is ordinarily inadmissible "only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*Smith, supra,* 35 Cal.4th at p. 357.) The trial court could reasonably conclude that Safarik's analysis of the evidence in this case was relevant to determining who killed Marie and why, each of the opinions was supported by a factual foundation established by trial witnesses, and the evidence was not substantially more prejudicial than probative.

Safarik's testimony is not comparable to that found in the cases cited by defendant in support of his contention that the trial court allowed inadmissible profile evidence. For example, *Robbie*, *supra*, 92 Cal.App.4th at page 1084 involved hypothetical questions by the prosecutor mirroring the conduct of the defendant as described by the victim, and an expert's response that the conduct was "'the most prevalent type of behavior that I've seen with sex offenders.'" The *Robbie* court deemed this inadmissible profile evidence. (*Ibid*.) Nothing of a similar nature happened in the instant case. Safarik was not asked to express an opinion based on hypothetical questions tracking defendant's conduct. As pointed out above, defendant was treated as a witness, and incriminating facts against him were not considered in Safarik's analysis of the crime scene and characteristics of the killer.

Also distinguishable are the drug courier cases cited by defendant, such as *People v. Covarrubias* (2011) 202 Cal.App.4th 1. In *Covarrubias*, a narcotics agent testified at length to the functioning of drug trafficking organizations. (*Id*. at p. 16.) The defendant was charged with transportation of marijuana and possession of marijuana for sale, but he was not charged with conspiracy, nor was there evidence the defendant had a role in a drug trafficking organization. (*Ibid*.) The court held that admission of expert testimony "concerning the structure and practices of drug

trafficking organizations" was error, although nonprejudicial. (*Id.* at pp. 18-19.) *Covarrubias* falls within the class of cases in which the expert testimony is "'irrelevant, lacks a foundation, or is more prejudicial than probative . . .'" (*Prince*, *supra*, 40 Cal.4th at p. 1226, quoting *Smith, supra*, 35 Cal.4th at p. 357), evidentiary defects not present in the instant case.

As set forth above, we have rejected defendant's state law contentions. Defendant's due process violation arguments "are without merit for the same reasons that defendant's state law claims have been rejected. (See *People v. Ward* (2005) 36 Cal.4th 186, 211.)" (*Prince*, *supra*, 40 Cal.4th at p. 1229.)

Moreover, as set forth above, the bulk of Safarik's testimony consisted of crime scene analysis, and there is no contention that his conclusions are not supported by evidence presented at trial. Assuming any portion of his testimony was inadmissible under Evidence Code sections 352 and 801, or the rules pronounced in *Prince*, *supra*, any error was harmless. The evidence of guilt, apart from any part of Safarik's testimony that did not qualify as crime scene analysis, was overwhelming. Most damaging was the DNA evidence connecting defendant to the crime, which was not disputed by defendant's own expert except as to one minor point. Defendant's conduct from the time Marie disappeared was inconsistent with innocence. Defendant has not established prejudicial error. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II

The trial court awarded defendant credit for 1505 days in custody but no conduct credits. Defendant argues that under the version of section 2933.1 in effect in November 1994, when Marie was killed, he was entitled to conduct credits equaling 15 percent of his custody credits, amounting to 225 days. The Attorney General agrees defendant was entitled to 225 days of custody credit under the language of applicable version of section 2933.1.

## DISPOSITION

The trial court shall amend the abstract of judgment to reflect conduct credits of 225 days and deliver a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

KUMAR, J.*

---

*     Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/3/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE, | B241930 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA071275) |
| v. | |
| ANDRE JACKSON, | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| Defendant and Appellant. | |


THE COURT:


The opinion in the above-entitled matter filed on November 7, 2013, is ordered published in the Official Reports pursuant to California Rules of Court, rule 8.1105(b).


_____

____

KRIEGLER, J.                                             MOSK, Acting P. J.