Filed 9/19/16  P. v. Ragland CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEANDRE FREDDIE RAGLAND, JR.,<br><br>    Defendant and Appellant. | B267961<br><br>(Los Angeles County<br>Super. Ct. No. BA420948) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Affirmed.

Willoughby & Associates, Anthony Willoughby and Amanda L. Derby, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jonathan M. Krauss and Ilana Herscovitz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant Deandre Freddie Ragland, Jr. guilty of the willful, deliberate, and premeditated first degree murder of Issac Osuman Umar. (Pen. Code, § 187, subd. (a).)[1] It found true the allegations that defendant personally discharged a firearm. (§ 12022.53, subds. (b)-(d).) The jury found not true the special circumstances that defendant committed the murder while engaged in the commission of a burglary and a robbery. (§ 190.2, subd. (a)(17).) The jury acquitted defendant of attempted second degree robbery of Umar (§§ 664/211), second degree robbery of Robert Muckleroy (§ 211), and second degree commercial burglary (§ 459). The trial court sentenced defendant to 50-years-to-life in prison, comprised of a term of 25-years-to-life for the murder conviction and 25-years-to-life for use of a firearm resulting in death under section 12022.53, subdivision (d).[2]

Defendant contends (1) the evidence was insufficient to support a guilty verdict for first degree murder, (2) the trial court violated his due process rights in denying defendant's request to present an expert on eye color, and (3) trial counsel provided constitutionally ineffective assistance in failing to retain an expert on eye color before trial.

We affirm.

## FACTS

*Prosecution Evidence*

Issac Osuman Umar, a Ghanaian immigrant, owned a store near 76th Street and Vermont Avenue in Los Angeles, where he sold African designs, furniture, area rugs, and tennis shoes. He also ran a tailoring business from the store, making clothing, which was distributed by five or six "youngsters," including defendant. Umar's store was one of

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Sentencing on the additional firearm use allegations under section 12022.53, subdivisions (b) and (c), was stayed.

2

several on the block.  Because of the crime rate in the area, the shop owners would open their stores at the same time, displaying their wares outside their respective stores.

**Eyewitness Testimony**

At about 11:50 a.m. on February 3, 2004, Eloise Jones was parked on 76th Street looking towards Vermont Avenue.  She saw "a young man standing in front of the building next to the laundry-mat [*sic*] . . . just standing there and he had gloves on, black gloves."  The man wore a white shirt and khaki pants.  He was Black, with fair skin, and in his late teens or early 20s.  He was short, only about five feet one inch or five feet two inches tall, and weighed about 180 to 190 pounds.  She did not see his face.  She "heard this pop, pop, popping noise and then . . . immediately looked up and that person wasn't there.  And then just within seconds, they came out running."  "He ran towards the - - in the parking lot to the laundry, jumped over the fence.  There was a car waiting and the car was going westbound."  The car was an older white car, like a Buick or Oldsmobile.  Defendant has the same features as the man Jones saw in 2004, with the same body shape and complexion.

Martha Ornelas was at a bus stop directly across the street when loud voices attracted her attention.  She heard "some shots and then a man fell down, half of his body was outside the door and the person that fired the shots, that person walked towards Florence and he lifted up his T-shirt.  He put the gun at the waistband and he left walking like nothing."  "They - - both of them were standing by the door.  As the other person was wanting him out of the door and that's when he did to him what he did right at the frame of the door and that's when the man - - where the man fell down."  The shooter was Black, about five feet five inches tall, weighed between 160 to 170 pounds, and had short curly black hair.  He was wearing brown Dickies, a loose white T-shirt, and black tennis shoes.  The man wore black gloves.  She did not see the shooter's face.

Richard Marshall owned a business across the street from Umar's store.  Umar kept his door open when he opened the shop.  Marshall never saw Umar open his

3

business and then close the door.  On the day of the murder, Marshall went outside and saw Umar's door was closed but his goods were outside.  Marshall heard Umar yelling, but could not make out what he was saying.  Marshall heard four gunshots, then saw Umar's door "slung open.  Somebody ran down the street.  [Umar] fell in the middle of his walkway in the doorway."  Marshall saw a fair-skinned "Black male, white T-shirt, black pants, five-six, five-seven."  The man was about 19 or 20 years old.  Marshall saw the man's profile and complexion.  Marshall called 9-1-1, saying that Umar got robbed, shot, and killed.  Defendant has the same profile and complexion as the man Marshall saw.  Marshall did not say that defendant was the man he saw that day, because it had been so long that he could not be sure if he was the same person.

Latausha Williams was walking across the street towards the laundromat when "an old whitish car, maybe a Cutlass" passed by.  The car pulled to the curb on 76th Street, and a boy got out.  As she crossed the street, she felt someone behind her and she turned around.  She saw a boy with a black hooded sweatshirt and black sweats.  She noticed that he had "cute eyes" that she thought were "pretty."  The boy turned into Umar's store.  Williams continued to walk straight ahead.  As she passed Umar's store, she saw that the door was closed, heard arguing, and a man with an African accent said, "No, stop, no, stop."  The store she wanted to go to was closed, so she went back to the intersection to cross the street.  Williams heard gunshots.  She saw the boy come out of Umar's store and noticed he "still had cute eyes."  His shirt was wrinkled with "kind of red stuff on it."  The boy she saw was of average height, no more than five feet eight, and weighed about 170 pounds.  He was no more than 30 years old.  After he left the business, he jumped into the same white car she had seen earlier and left the area.  Williams went home and called 9-1-1, stating she saw the shooter and he had light skin and "colorful eyes."  The 9-1-1 operator asked if the eyes were green, and Williams said, "Yeah.  Colorful.  Uh-huh."  That day, the police showed her six photographs.  She picked someone that she knew, with a nickname of Greasy, knowing that he was in jail and could not be the shooter.  In October 2013, Williams was shown another series of photographs, where she recognized the killer and circled his photo.  At trial, she testified that the shooter had

4

"colorful eyes" that were "not your average brown" and appeared "light greenish" on the day of the shooting.  Williams was impeached with her preliminary hearing testimony that defendant's eyes were changing color at the hearing.  She maintained at trial that defendant's eyes were "still light and colorful" and "light green," not the brown she saw in his eyes at the preliminary hearing.  She was "a thousand percent sure" that defendant was the man she saw the day of the murder.

### 9-1-1 call by Robert Muckleroy

Umar's store clerk, Robert Muckleroy, called 9-1-1 after the shooting.  Muckleroy died before trial, but his 9-1-1 call was played to the jury.  He explained that "[a] guy's been shot, there's a robbery."  He described the suspect as "[B]lack. . . .  He don't have a shirt.  They got into a fight and the guy took his shirt off.  I don't know what he got on.  I don't even know if he got a shirt on.  A sweatshirt is layin' on the floor."  "[T]he sweatshirt he had on is still layin' on the floor 'cause when they got to fightin' the shirt came off."

### The Investigation

Sergeant Steve Vera and Detective Gregory Stearns both responded to the shooting.  Sergeant Vera saw Umar in the "doorjamb . . . on his back.  His head was facing out from the business eastbound direction.  His feet were facing into the business."  An individual approached Sergeant Vera and "directed [his] attention to an item, a black item sweatshirt, that was inside the business, [and] said that that belonged to the suspect."  Detective Stearns observed one round of live ammunition outside of the business, a hooded sweatshirt in the business, and bullet impacts to various walls and the door of the business.  He also saw a safe inside the business and a wallet that belonged to Muckleroy.  The sweatshirt was taken into evidence.

An autopsy revealed that Umar had five gunshot entrance wounds.  He had

5

wounds underneath his chin, just below the right clavicle, below the left breast passing to underneath the neck, the back right scapula through the chest, and below the scapula. The shot below the scapula was fatal, entering the back just below the scapula, passing through the right lung, the aorta, and the left lung.

Criminalist Susan Rinehard screened the sweatshirt for bodily fluids and placed a placard on items she believed to be blood. Criminalist Alejandra Ramirez performed a blood search on the black sweatshirt. The sweatshirt had a red stain that tested positive for blood. Ramirez took cuttings from the sweatshirt for DNA testing. She also submitted clippings from Umar's fingernails. Jeffrey Alden Thompson was the assistant laboratory director for the Los Angeles Police Department scientific investigation division. He examined the sweatshirt, focusing on the interior rear collar and front chest area. The interior rear collar is where most people will leave DNA from sweating; the upper chest is tested because when people exhale they may leave saliva, and thus DNA, in that area. He sent four swabs for DNA testing: two from the upper chest and two from the interior rear collar.

The case became inactive in 2006. On October 1, 2012, Detective Stearns received a letter from the California Department of Justice, stating that the DNA profile from the sweatshirt matched defendant. Detective Stearns took a swab of saliva from defendant for DNA testing.

DNA analyst Kelli Byrd worked with Cellmark Forensics in Dallas, Texas. She compared the DNA samples from the sweatshirt to Umar and defendant. Umar's DNA was in the red stain on the front of the sweatshirt. Another stain contained a mixture from two individuals, both with partial profiles that were insufficient to make any conclusions about defendant, and Umar could not be excluded as a contributor. One cutting from the interior collar of the sweatshirt contained a mixture of DNA. The major profile matched defendant; the minor profile was a partial profile from an unknown individual. The major profile of defendant on the collar appears in one in 25.19 quadrillion individuals. The clipping from the chest area of the sweatshirt contained a mixture of three people, including at least one male. Defendant and Umar could not be

6

excluded as possible contributors to this mixture. The fingernail clippings from Umar's right hand contained a mixture of at least two individuals; no conclusions could be made regarding defendant.

On October 14, 2003 Culver City Police Officer Jason Davis pulled defendant over. Defendant was driving a white 1983 Chevy Malibu four-door. The owner of the car is defendant's grandfather, Henry Wilbert Randle, who occasionally allowed defendant to use the car to look for jobs.

*Defense Evidence*

Randle and his wife would often buy hooded sweatshirts for defendant. Defendant frequently lost his clothing. Defendant has worn glasses since he was four years old and wears bifocals, although defendant was able to pass a driving test without using his glasses. Detective Stearns believed that defendant has brown eyes. All the police reports and arrest reports indicate defendant's eyes are brown. The jury viewed defendant's eyes.

## DISCUSSION

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support the jury's finding that his killing of Umar was willful, deliberate, and premeditated, as required for murder in the first degree. We disagree.

**Standard of Review**

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to

7

determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Murder is defined as "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) First degree murder includes "any . . . kind of willful, deliberate, and premeditated killing . . . . All other kinds of murders are of the second degree." (§ 189.)

"'The test on appeal is whether a rational juror could, on the evidence presented, find the essential elements of the crime—here including premeditation and deliberation—beyond a reasonable doubt.' (*People v. Stewart* (2004) 33 Cal.4th 425, 495.) A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner. (*People v. Anderson* (1968) 70 Cal.2d 15, 27, see *People v. Thomas* (1992) 2 Cal.4th 489, 517 [*Anderson* provides framework or guidelines typically used to evaluate evidence of premeditation and deliberation].)" (*People v. Romero* (2008) 44 Cal.4th 386, 400-401.)

"The *Anderson* factors are not the exclusive means for establishing premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) This court has, for

example, concluded that an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive. (*People v. Hawkins* (1995) 10 Cal.4th 920, 957.)" (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127.)

### Analysis

Defendant argues that no rational jury could believe Umar's murder was deliberate and premeditated. He claims that the evidence only supports an inference that the murder was the result of a botched robbery and all the evidence in support of premeditation points to the planning of a robbery, not a murder.

We reject defendant's claim that the evidence merely shows a failed robbery. Although the prosecution argued for convictions for robbery and burglary at trial, as well as the corresponding special circumstance, the supporting evidence was weak and rejected by the jury in its verdicts. Defendant was convicted of only one substantive crime—the willful, deliberate, and premeditated murder of Umar. Substantial evidence supports the jury's determination that the murder was an intended execution of Umar. The prosecution presented strong evidence of planning, a motive, and a manner of the killing that supports first degree murder.

A reasonable trier of fact could find ample evidence of planning to kill Umar. There was evidence that defendant knew Umar and had been to his store, so he would have expected Umar to be present. Defendant wore gloves and a hooded sweatshirt, and apparently concealed a loaded firearm. He closed the door to the store, blocking the public's view of his attack on Umar. A getaway car tied to defendant waited outside while the murder was committed, and departed with defendant inside immediately after the killing. That defendant had a prior relationship with Umar and arrived under the circumstance described above suggests a motive to kill, rather than a random act of violence. (Compare *People v. Caro* (1988) 46 Cal.3d 1035, 1050.) The jury could infer that defendant wore gloves to cover any fingerprints that may have been left behind.

9

Firing multiple gunshots into the victim, in rapid succession, is consistent with premeditation and deliberation.  (*People v. Mariquez* (2005) 37 Cal.4th 547, 577; *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 ["The manner of killing, while not an execution-style single shot to the head, could still support a finding of premeditation and deliberation, as defendant quickly fired three shots at the victim, with a shotgun, from a relatively close range"].)  "There is little indication that the murder was rash and impulsive, as when a defendant acts out of a fear or passion in response to a provocation that is insufficient to show an absence of malice.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 866-867; *People v. Dewberry* (1959) 51 Cal.2d 548, 553.)"  (*People v. Sandoval* (2015) 62 Cal.4th 394, 425.)

Nothing in the evidence suggests, as a matter of law, that defendant acted rashly and without deliberation.  The evidence is decidedly to the contrary.  Viewed in the light most favorable to the judgment, a rational trier of fact could find that defendant consciously embarked on a course intended to kill someone he expected to find at a known location.  The verdict is supported by substantial evidence.

### *Eye Color Expert*

Defendant contends the trial court abused its discretion when it denied his request to call "an Ophthalmologist, an Optometrist, or some other expert in the field of eye biology" to show that (1) defendant's eyes are brown and incapable of changing colors and (2) that Williams was lying when she claimed that defendant's eyes are green.  He asserts the exclusion of his proffered expert testimony violated his Fourteenth Amendment right to a fair trial and due process of law.  We disagree.

#### **Relevant Proceedings**

At various times, Williams had described the shooter as having beautiful, colorful green eyes, and explained that she could still identify the shooter by his "cute" eyes a

decade after the shooting. The prosecutor argued to the jury that Williams's identification of defendant as the shooter was essential to its case, and that Williams could recall defendant because of those "cute" eyes.

Defendant has brown eyes. Williams testified to seeing that defendant's eyes were green at trial, and that she saw defendant's eyes change from brown to green at the preliminary hearing. After hearing Williams' testimony, defense counsel asked the court for permission to call an expert in eye color, Dr. Alan Shabo, to testify that defendant's eyes are in fact brown and structurally incapable of changing color as "[i]t's a matter or pigment and the only people's eyes can actually change shades are people that have very little pigments in their eyes." The prosecutor maintained that defendant should not be permitted to call this expert due to the late disclosure, as this late discovery would unduly prejudice the prosecution case.

The trial court ruled Dr. Shabo's proposed testimony inadmissible: "I'm going to deny the request for the defense to appoint an expert at this time and my thought is, essentially, that the witness, Ms. Williams, her testimony is premised upon her perception of the defendant's eyes and the expert, of course, cannot testify as to what her perception is. [¶] I'm not even sure that the issue of an individual's eyes changing color, an individual that has brown eyes changing color is even outside of the scope of an ordinary layperson's knowledge that eyes don't change color if you have brown eyes. [¶] So I think that this matter is one of perception, it's not subject to expert opinion, in my judgment. [¶] And further, I am not predicating this based upon the late request for an expert. I don't think this would take a great amount of time. It's basically the need for the expert which I don't believe is necessary. [¶] However, [defense counsel] did request an alternative resolution to this. I recognize that it's probably not the primary goal that he was seeking, which was to appoint an expert, which was to have the jury be able to look at [defendant's] eyes. [¶] I think that's a reasonable request based upon the fact that the witness in this room was able to say that from where she was, she could observe [defendant's] eyes and she said they were green." Defendant was allowed to ask Detective Stearns what color the defendant's eyes were.

11

The jury was allowed to view defendant's eyes. The trial court reiterated why it permitted the view: "[Williams] looked at [defendant] right now in this courtroom, what she believed his eye coloring was and she said green. That is her perception. [¶] The jury, in my judgment, is entitled to assess her credibility by virtue of determining if that perception is appropriate. But you're free to argue that one person's perception can be completely different from another person's perception." The court continued: "I mean, you got everything else you need in this record, in my judgment, you got the color of his eyes, you got pictures. You got the investigating officer, Detective Stearns, saying he has brown eyes. [¶] And what their perception is of his eyes, I think that's a very clear-cut argument for you all to make as to people's hair color, eye color. It's just - - this is perception, that's all it is."

**Applicable Law**

"A witness may testify as an expert, in the form of an opinion, on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).)" (*People v. Jackson* (2013) 221 Cal.App.4th 1222, 1237.) Expert testimony "will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness' (*People v. Cole* (1956) 47 Cal.2d 99, 103)." (*People v. McDonald* (1984) 37 Cal.3d 351, 367 (*McDonald*);[3] *People v. Smith* (2003) 30 Cal.4th 581, 627-628 (*Smith*).) "Credibility questions are generally not the subject of expert testimony . . . ." (*Smith*, *supra*, at p. 628.) Admission of expert testimony is reviewed for abuse of discretion. (*Id.* at p. 627; *People v. Gonzalez* (2006) 38 Cal.4th 932, 944.)

---

[3] Overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 923-925.

**Analysis**

Defendant's proposed expert testimony was intended to prove that defendant's eyes were brown rather than green. Defendant believed that Williams's testimony was central to identifying him as the shooter, and that proving his eyes were brown would show that he was not the man Williams saw that day on the day Umar was shot and killed. Defendant also believed testimony showing his eyes cannot change color and are never green would undermine Williams's credibility when she claimed to see that defendant's eyes appeared green at trial.

The trial court did not abuse its discretion in ruling that Dr. Shabo's testimony was inadmissible. As the court properly recognized, the issue was Williams's perception of the color of defendant's eyes. Dr. Shabo could offer no testimony on Williams's perception. To the extent Williams insisted the color of defendant's eyes were green, the jurors were able to view defendant and draw their own conclusions. The jury also received evidence that police reports identified defendant as having brown eyes, and a detective testified defendant's eyes were brown. Given this record, the trial court rationally concluded that the proposed expert testimony did not relate to a subject beyond the common experience of jurors and that the opinion that eyes do not change color would not assist the jury in resolving a material issue. (See Evid. Code, § 801, subd. (a).)

Defendant's reliance on *McDonald*, *supra*, 37 Cal.3d at page 363, is misplaced. *McDonald* involved proposed expert testimony on false identification and the unreliability of eyewitness identification, matters beyond the common experience of most jurors. *McDonald* does not hold that the trial court must permit expert testimony on an issue relating to identification. (*People v. Plasencia* (1985) 168 Cal.App.3d 546, 553-556 [trial court has discretion to exclude expert testimony on eyewitness identification, and no abuse of discretion shown under the facts of the case].) Nor does *McDonald* require admission of expert testimony that usurps the jury's role of determining the credibility of a witness. (*People v. Page* (1991) 2 Cal.App.4th 161, 188.)

Here, the relative believability of Williams, insofar as her identification relied on

13

eye color, could be judged by the jury based on the totality of a well-developed record. The trial court could conclude, in its discretion, that Dr. Shabo's proposed testimony would not assist the jury in resolving the issue of identification of defendant.

**Harmless error**

Error in excluding expert testimony requires reversal only if prejudicial. (*McDonald*, *supra*, 37 Cal.3d at p. 376.) We examine the entire record to determine whether there is a reasonable probability that defendant would have obtained a more favorable result in the absence of error. (*Ibid.*, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) When "the trial court merely reject[s] some evidence concerning a defense, and [does] not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson*, *supra*, 46 Cal.2d at page 836. (*People v. Fudge* [(1994) 7 Cal.4th 1075,] 1103.)" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) When a trial court's ruling precludes a defendant from presenting a defense, we evaluate the error to determine whether it is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Cunningham* (2001) 25 Cal.4th 926, 998 (*Cunningham*).)

Any error here was harmless under both the state and federal standards. Defendant established that he has brown eyes. Jurors saw defendant every day at trial and would be able to determine what color his eyes were during trial. The judge permitted a special view of defendant's eyes so that jurors could determine for themselves whether or not defendant's eyes were green or brown. They would also be able to determine whether or not his eyes appeared to be of the type that would change appearance depending on the lighting. Defendant elicited testimony from Detective Stearns that defendant's eyes were brown, and his eyes were described as brown in various police reports for over a decade.

As the trial court noted, defendant was successful in undermining Williams's credibility, pointing out several times when Williams had admittedly lied to police and

potentially lied during trial. The trial court instructed the jury to evaluate Williams's credibility, and that the jury could decide what portions of a witness's testimony to believe. The jury was not obligated to believe Williams's testimony regarding eye color, or anything else.

Ample evidence, apart from Williams's identification, connected defendant to the murder. (See *People v. Sanders* (1990) 51 Cal.3d 471, 505-506 [assuming it was error under *McDonald* to exclude expert testimony on eyewitness identification, any error was harmless where other testimony and physical evidence linked defendant to the charged murders].) The getaway car resembled a car belonging to defendant's grandfather, who sometimes lent the vehicle to defendant. Three other witnesses described the shooter as being similar in appearance to defendant. Muckleroy called 9-1-1 and stated that the shooter had left a sweatshirt behind after the shooting. The sweatshirt was found at the scene, stained with the victim's blood. Defendant's DNA, found in the population at a frequency of one in 25.19 quadrillion individuals, was recovered from the sweatshirt left behind by the killer. Defendant offered only a weak explanation as to why his bloodstained sweatshirt was recovered at the scene. The DNA evidence is far more compelling than Williams's questionable identification of defendant. We hold there is no reasonable probability or possibility that defendant would have received a more favorable outcome had defendant been permitted to call an eye color expert.

*Ineffective Assistance of Counsel Claim*

Defendant's final contention is that trial counsel's failure to secure an eye color expert before trial constitutes ineffective assistance of counsel. We conclude that upon the record presented, defendant cannot show the necessary prejudice to warrant reversal.

**Standard of Review**

"To secure reversal of a conviction upon the ground of ineffective assistance of

15

counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694; see *Williams v. Taylor* (2000) 529 U.S. 362, 391-394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068.) 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *People v. Riel* (2000) 22 Cal.4th 1153, 1175.)" (*Cunningham*, *supra*, 25 Cal.4th at p. 1003.) The Supreme Court has held that "[t]he performance component [of the analysis] need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' (*Strickland v. Washington*[, *supra*,] 466 U.S. [at p.] 697.)" (*Smith v. Robbins* (2000) 528 U.S. 259, 286, fn. 14.)

**Analysis**

Defendant has not satisfied the second prong of ineffective assistance of counsel, because there is no reasonable probability that he would have obtained a more favorable result had an expert been retained earlier. First, the trial court rejected defendant's request to call this expert under the facts of the case. There is no reason to believe the trial court would have admitted Dr. Shabo's testimony had it be proffered earlier at trial, as the legal reasoning on the issue would be the same. The court's ruling during trial specifically eschewed finding the request to call Dr. Shabo was untimely.[4] Second, as

---

[4] The trial court's recollection was different by the time of the motion for new trial, as the court indicated the request was denied in part as untimely. The court's different recollection on this point is of no moment, as we "review . . . the record that was before the trial court at the time of the ruling. (*People v. Price* (1991) 1 Cal.4th 324, 388.)" (*People v. Burch* (2007) 148 Cal.App.4th 862, 867.)

16

discussed above, there was ample evidence of defendant's involvement in this murder even absent testimony regarding the color of the shooter's eyes. Because defendant suffered no prejudice, his ineffective assistance of counsel claim fails. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-688, 691-692.)

## DISPOSITION

The judgment is affirmed.


KRIEGLER, Acting P.J.


We concur:


BAKER, J.


KUMAR, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.