Filed 2/17/26  P. v. Roberts CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH ROBERTS,<br><br>        Defendant and Appellant. | A171091<br><br><br>(Alameda County<br>Super. Ct. No. 23CR008811) |

A jury convicted Joseph Roberts of the second degree murder (Pen. Code, § 187, subd. (a)) of his girlfriend, Rachel Elizabeth Imani Buckner, and the trial court sentenced him to 15 years to life in prison.  He challenges only a single evidentiary ruling, contending that the court abused its discretion in admitting certain expert testimony by the forensic pathologist who performed Buckner's autopsy.  We conclude that he forfeited the theories on which he now challenges the testimony by not objecting on those bases in the trial court, and that any error was in any event harmless.  We thus affirm the judgment and remand solely for the Superior Court to amend the abstract, as the parties agree it must, to correct Roberts's presentence custody credits.

## BACKGROUND

### *Roberts and Buckner's Abusive Relationship*

Roberts and Buckner were law school classmates who began dating in 2019 when Buckner was pregnant and living with her mother.  In 2021, Roberts and Buckner moved to an apartment complex in Pleasanton.  In

January 2022, Buckner surrendered custody of her child; Buckner's mother became the child's guardian; and in February, a court ordered Roberts and Buckner to have no contact with either.

At trial, copious evidence showed that Roberts controlled Buckner, isolated her from friends and family, and abused her verbally and physically. In August 2022, Buckner came to her mother's house, where a doorbell camera showed her bandaged, with discolored eyes and face, crying. In June 2023, Buckner told her mother by phone that Roberts had beaten her up; that no one knew what he had been doing to her or had come to save her; and that she had left him, but had no money or place to stay. During the call, Roberts phoned Buckner, who became terrified and hung up.

Two childhood friends described how Buckner stopped communicating with them, and how they saw Roberts control and isolate her, while Buckner showed great fear of him. In August 2022, Buckner called one of the friends, distraught and frightened, and said Roberts was going to kill her.

Neighbors heard arguments, screams, bangs and thumps, and crying from Roberts and Buckner's apartment, including him calling her a "bitch" or "whore" and saying things like, "what the fuck do you think you're doing[?]" and "shut the fuck up, bitch." In May 2023, a neighbor heard a commotion and saw Buckner outside, naked. She threw Buckner a blanket, went back into her own apartment to call 911, and returned to find Buckner hiding in a parking area, crying, with scratches on her arms and legs, but unwilling to call the police.

***The Murder and Dismemberment***

Sometime in mid-July 2023, Roberts killed Buckner.[1]  (All dates below are in 2023 unless otherwise noted.)  It was impossible to determine *how* he did so, because Roberts used a power saw to dismember Buckner's body in their apartment's bathroom, removing her head, hands, and feet (which had not, by the time of trial, been found).  On July 19, after researching topics including fingerprint recovery from plastic bags and nearby green spaces, fields, and parks, Roberts put the rest of Buckner's body in a plastic bag that he duct-taped shut, leaving genetic material on the tape; took the bag to Bay Farm Island, where cell towers generated a record of his phone's presence on July 19; and left the bag in a marshy area.  Back in the apartment, Roberts tried to eliminate evidence of the dismemberment by tearing out carpeting, removing bathroom fixtures, and cleaning.  But traces of blood and bone that were very likely Buckner's remained.

***The Investigation***

On July 19, a dog walker found the plastic bag but thought it held an animal and did not report it; the next day, another dog walker found the bag and called the police.  Over the next seven weeks, an investigation followed, which included an autopsy by Dr. Michael Hunter, chief medical examiner for San Joaquin County, acting on a contract basis as a forensic pathologist for

---

[1] A professor who had Roberts and Buckner in a summer session class spoke to Buckner on July 12 about a brief due on July 14, tried to contact her on July 14 when she did not turn it in, but got no response.  On July 17, Roberts emailed the professor that he had a family emergency and would turn in work on July 18, but did not do so.  On July 19—the day Buckner's body was found, as noted below—Roberts, upset, told the professor that a family member had died, and he dropped out of the class.  He resumed class in August.

Alameda County. In addition, a forensic anthropologist examined the body and concluded that it had been dismembered with a power saw.

As the investigation proceeded, Roberts repeatedly used Buckner's car; DMV security cameras recorded him reregistering it on August 25. Cellphone location records showed that he carried Buckner's phone. In August, he began to meet women on Tinder, variously saying he had recently broken up or had recently had a roommate move out.

After being arrested on September 6, Roberts told a detective, in an interview played at trial, that Buckner suffered from mental illness, he had not seen her for a month, and she had left without them breaking up. He said that Buckner had attempted suicide "eight or nine times," had threatened to do so recently, and was probably with her mother. Upon learning that Buckner's body had been found, Roberts stated that "debt collectors" were after her, and then said, "Suicide. Suicide is the answer."

A search of the apartment revealed the removal of nearly all the carpeting and of the shower curtain in the hallway bathroom, in which the bathtub drain held a bone fragment from Buckner's body, with cut marks consistent with those on the remains in the plastic bag. The bathroom also contained bottles of bleach and Drano. A dog trained to detect human remains alerted in several spots, including near the bathtub.

Police also found a notebook in which Roberts had written, "[Buckner] distracted me from creating a relationship with God, all relationships, even this one," and a list: "[n]ew doors, carpet, fix walls, paint, towel rod, bath mat, drill, clear kitchen, . . . [d]resser in kitchen, footlocker." A note on Buckner's phone—created at an unknown time—read, "body-head-limbs, get rid of tattoo." (Buckner had distinctive tattoos. )

4

*Legal Proceedings.*

In October 2023, the Alameda County District Attorney charged Roberts with murder, and he was tried by jury in March–May 2024.

*Dr. Hunter's Testimony*

Dr. Hunter testified both as a percipient witness and as an expert in forensic pathology. As a preliminary matter, he explained to the jury the distinction between "cause of death," which is the "specific reason for [a] person to die," and "manner of death," which is the way in which the cause of death arose (and which may turn on the type of human agency involved, if any). On cross-examination, he identified the five options for classifying manner of death: natural, accidental, suicidal, homicidal, and undetermined (which is disfavored).

With regard to case-specific testimony, Roberts had unsuccessfully moved in limine, as discussed below, to bar Dr. Hunter from stating an expert opinion that "the [manner[2]] of death was homicidal violence." Hunter testified that he found nonfatal knife wounds to Buckner's legs and torso but was unable to identify a cause of death involving disease or organ abnormality in, or injury to, the available parts of the body. Nor did the toxicology report, which showed medications used to treat depressive disorder and some bipolar disorders, reveal an overdose as the cause of death. The body parts used to assess strangulation were mostly absent. While Hunter never squarely stated that the dismemberment had occurred after death (i.e.,

---

[2] Roberts's written motion referred to an opinion that "the *cause* of death was ' homicidal violence ' " (italics added), but as his counsel acknowledged in arguing the motion, this was a misnomer: "homicidal" is a *manner* of death, not a *cause* of death. At the hearing, Roberts's counsel orally "fine tune[d]" her argument to make clear that what Roberts challenged was any opinion that the *manner* of death was homicidal.

5

dismemberment could not have been the cause of death), he found the evidence "consistent with [it] being postmortem."

On direct examination, the prosecutor asked Dr. Hunter if he had determined a manner of death.[3] After explaining that pathologists determine manner of death "based on not just the autopsy examination but the circumstances of [a] death," including how a body was found and whether anyone had tried to remove evidence or hide the body, Hunter said, "I felt it was best to classify this as a homicidal death," though he was "not clear exactly what that homicidal mechanism was."

Dr. Hunter acknowledged that he had not been able to determine the cause of death; when asked why, he replied, "I suspect or I believe that there were likely injuries to the head." Defense counsel objected based on speculation, the court overruled the objection, and Hunter added, "because I'm not seeing lethal injuries to the torso and I'm not seeing lethal injuries to the extremities, it leads me to believe that there were injuries . . . to the head and neck area, the part of her that I don't have to look at."

On cross-examination, Dr. Hunter testified that pathologists determine cause and manner of death to a reasonable medical certainty, a less strict standard than beyond a reasonable doubt, and that it was thus fair to say that he "can't tell [a] jury what to do about a specific death."

---

[3] In Alameda County's sheriff-coroner system, a forensic pathologist is responsible only for identifying *cause* of death, but may offer an opinion about *manner* of death to the Sheriff, who ultimately determines manner of death. Hunter was thus responsible for determining only the cause of Buckner's death. But as a current and past chief medical examiner in other counties, Hunter had been responsible for determining both causes and manners of death. The trial court, in a ruling Roberts does not challenge, found Hunter qualified as an expert on both issues.

Defense counsel then inquired about head injuries, as follows: "[Counsel]: [Y]ou said that you suspected head injuries for this particular autopsy, right? [Dr. Hunter]: I do suspect head injury or a neck injury in this case. [Counsel]: Based upon what medical piece of evidence? [Hunter]: Well, there is none. [Counsel]: Right. [Hunter]: And that's the thing. I don't have a reason specifically why this person has died. [Counsel]: So you don't have any foundation as to why you would say it was a head injury? [Hunter]: The only foundation is the lack of a head to examine and a death that clearly, the features of its presentation and circumstances suggest an act by another person." Hunter acknowledged that he could not exclude the possibilities that Buckner died by accident or by suicide—such as by shooting herself in the head or slitting her wrists—before the dismemberment. In conclusion, defense counsel asked, "So at the end of the day, do you know how this woman died?" and Hunter answered, "I don't specifically have a reason why she died."

### *Verdict and Sentencing*

The jury found Roberts guilty of second degree murder, and the court sentenced him to 15 years to life.

## DISCUSSION

The lone way in which Roberts contends the trial court erred is by, as he puts it on appeal, "admitting expert testimony that [Buckner] suffered a head injury," which he deems "inadmissible as a legal conclusion." (Capitalization omitted.) We review decisions to admit expert opinion testimony for abuse of discretion. (*People v. Jackson* (2013) 221 Cal.App.4th 1222, 1237, citing *People v. Fuiava* (2012) 53 Cal.4th 622, 672.) Roberts has shown no such abuse, we conclude, for he forfeited his arguments on appeal by not objecting at trial (or in limine) to Dr. Hunter's testimony on those

7

bases (see Evid. Code,[4] § 353, subd. (a) [appellate court may reverse only if party objected to evidence on the "specific ground" raised on appeal]), and nor has he shown that any arguable error in admitting the opinion was prejudicial.

## I.

### *Roberts Forfeited His Claim By Not Objecting to the Cause-of-Death Opinion Below on the Grounds He Now Raises*

As noted, Roberts moved in limine to exclude Dr. Hunter's "proposed testimony that the [manner] of death was 'homicidal violence,' " noting that witnesses may neither express opinions about a defendant's guilt or innocence nor declare what the law is, and contending that Hunter's proposed opinion had, as relevant on appeal[5], two flaws: (1) "it is speculation that [Buckner] was a victim of homicide" and (2) "it invades the province of the jury."

Roberts made those objections *solely* to Dr. Hunter's proposed opinion that the *manner* of death was homicide—not to a proposed opinion that the *cause* of death was a head injury.  Roberts argued, first, that Hunter's opinion about the manner of death was speculative because it "does not appear to be based on any medical information" but on Hunter having "take[n] the circumstances of [Buckner's] body, including [its] dismemberment, location . . ., etc. and then *speculate[d]* that, essentially, 'it must have been homicide.' "

Second, to argue that Dr. Hunter's opinion "invades the province of the jury," Roberts quoted a passage from *People v. Rouston* (2024) 99 Cal.App.5th

---

[4] All undesignated statutory citations are to the Evidence Code.

[5] Roberts also deemed the opinion "inadmissible under [Evidence Code] § 352."  He does not renew that claim, and it is not otherwise relevant, on appeal.

8

997 (*Rouston*) stating that, while experts may express opinions that " 'embrace[] the ultimate issue to be decided by the trier of fact' " (*id.* at p. 1010, quoting § 805), they may not express opinions that " 'invade[] the province of a jury to decide a case.' " (*Ibid.*) Such opinions, he noted, are excluded " 'not . . . because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful). "[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case." " '[W]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' [Citation.]" ' " (*Ibid.*) Observing that the court would instruct his jury that " '[h]omicide is the killing of one human being by another' " (quoting CALCRIM No. 500), Roberts argued that "*they*, not Dr. Hunter, [must] determine if that fact has been prove[n] beyond a reasonable doubt," and that "to allow the opinion that [Buckner] was killed by another would be, in *Rouston*'s terms[,] 'too helpful.' "

In oral argument on the motion, Roberts's counsel addressed only Dr. Hunter's use of the term "homicide." Summarizing her position at an initial hearing, counsel said, "My fundamental, my core, is the word 'homicide.' My core problem with it is the word 'homicide' because I think that that is a jury determination." After the court tentatively decided to allow the testimony, counsel again focused the next day on the terms "homicide" and "homicidal violence." The court responded that using those terms did not amount to opining that Roberts was guilty, as "it says nothing about who is responsible. He's not taking that decision away from the jury at all. He is saying that the manner of death in this situation was homicidal violence, as opposed to an accident, a medical failure. He's not pointing the [finger] at Mr. Roberts." Defense counsel rejoined that the term was

9

improper "because there is a universe [in which] she was not killed, but she was dismembered. . . . [I]f the expert is allowed to say that she died by homicidal violence, he is taking an element out of the hands of the jury. He is taking [their ability to apply the definition of 'homicide' in] CALCRIM 500 away." Unpersuaded, the court noted that it would instruct the jury "that this is an expert's opinion, and you can accept it or reject it."

During Dr. Hunter's testimony, as noted, Roberts's only relevant objection came when the prosecutor asked, "Were you able to determine the cause, the reason why [Buckner] ultimately died?," Hunter answered, "No," the prosecutor asked, "Why not?," and Hunter answered, "Well, I suspect or I believe that there were likely injuries to the head." At that point, defense counsel stated, "I would object as pure speculation." She did not object on the basis that the opinion invaded the province of the jury.

In sum, Roberts made two objections: (1) he objected to testimony that the *manner* of death was "homicide" or "homicidal violence" as speculative and as invading the province of the jury by stating, in a "too helpful" way, an opinion on an issue as to which " 'the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions' " (*Rouston*, *supra*, 99 Cal.App.5th at p. 1010), and (2) he objected to testimony that the *cause* of death involved a head injury solely on the basis that it was speculative (a claim he does not renew in this court).

On appeal, Roberts raises a pair of new, overlapping objections directed solely at Dr. Hunter's opinion that the cause of death likely involved a head injury. He does not renew on any basis his challenge to the admissibility of Hunter's opinion that the *manner* of death was homicidal violence.[6] Roberts's

---

[6] On appeal, Roberts implicitly concedes the issue on which his trial counsel heavily focused—i.e., whether Dr. Hunter could opine that the *manner* of death was homicide—by limiting himself to observing, in a

10

overarching theory on appeal is that the trial court abused its discretion in letting Hunter opine "that the victim suffered a head injury" not because that opinion was speculative—his sole objection below—but "because it was inadmissible as a legal conclusion." (Capitalization omitted.) Under that rubric, Roberts makes two arguments, both of which are forfeited, and the second of which lacks merit.

Roberts's main argument is that "[b]ecause the head was unavailable for examination, whether Buckner suffered a head injury was a 'legal question' about the 'manner in which the law should apply to particular facts,' " and Dr. Hunter's opinion "usurped the jury's function because it was an expert conclusion about an issue not beyond jurors' common knowledge" (citing § 801 [expert testimony must address matter "sufficiently beyond common experience that it would assist the trier of fact"]). As we have just seen, this is the basis on which Roberts objected to Hunter's proposed opinion that the *manner* of death was homicidal violence, not to his opinion that the *cause* of death was a head injury. As set forth in more detail below, Roberts has thus forfeited his claim that the cause of death opinion was improper on that basis. (§ 353.)

---

footnote, that "It is not even clear that a pathologist can testify that a 'homicide' occurred"; quoting a concurring opinion stating, "We need not decide. . . whether a forensic pathologist is authorized to render an opinion regarding the ultimate question whether a killing was or was not a homicide" (*People v. Steele* (2002) 27 Cal.4th 1230, 1276 (conc. opn. of George, C.J.)); and string-citing out-of-state authority. We find it clear that, by placing this observation in a footnote, Roberts did not attempt to develop an argument for reversal on that basis, but instead to acknowledge, while shifting tack on appeal, that his main argument below is not legally viable. (If instead Roberts did mean to raise the argument on appeal, he failed to do so: His footnote falls far short of being an adequately developed argument set forth in text, under a distinct heading, and supported by discussion of relevant authority. (Cal. Rules of Court, rules 8.204(a)(1)(B), 8.360(a).))

Roberts's other newly raised argument is that Dr. Hunter's opinion was inadmissible "for the related reason that it constituted an opinion about [Roberts]'s guilt." This argument is not only forfeited, but wrong on its face. Hunter's opinion concerned an issue that is clearly factual—in what part of the body did the physical process that caused death occur?—, not the ultimate legal issue of guilt. Even were Roberts correct that the opinion was the final fact in a set of facts collectively enabling the jury to find him guilty, that would show only its relevance, not any impropriety in admitting it.[7] Because this argument lacks merit, we need not discuss it further.

---

[7] Roberts tries to analogize this case to *People v. Killebrew* (2002) 103 Cal.App.4th 644, disapproved on other ground by *People v. Vang* (2011) 52 Cal.4th 1038, 1048, but *Killebrew* involved a very different sort of issue: whether a gang member charged with conspiracy to possess a handgun could be found to have possessed the gun *constructively* by being in the same car as other gang members, absent evidence that he ever *physically* held the gun. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 652.) The expert impermissibly opined that, as the court of appeal summarized it, "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Ibid.*) The topic was "not one for which expert testimony is necessary," the court held, explaining that it had been proper to allow expert testimony "that a gang would expect retaliation as a result of a [recent] shooting, that gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed," but that, "[b]eyond that, [the expert] simply informed the jury of his belief of the suspects' knowledge and intent on the night in question, issues properly reserved to the trier of fact." (*Id.* at p. 658.) Dr. Hunter did not inform the jury of any belief about Roberts's state of mind or conduct, let alone the ultimate issues turning on his mental state and conduct (i.e., whether, with malice aforethought, he committed an act that caused Buckner's death (CALCRIM No. 520)). Hunter addressed only the factual issue of what part of Buckner's body was the site of the injury that (however it arose) caused her death. The disputed issue in *Killebrew*—constructive possession—was a mixed issue of law and fact in which the legal element predominated; the issue here was a pure question of fact.

In support of his first new argument—that Dr. Hunter's cause-of-death opinion addressed a matter within common knowledge—Roberts notes that expert testimony cannot comprise " 'inferences and conclusions which can be drawn as easily and intelligently by the trier of fact' " (quoting *People v. Torres* (1995) 33 Cal.App.4th 37, 45, disagreed with on other ground in *People v. Mendoza* (2022) 74 Cal.App.5th 843, 851). While Hunter's description of Buckner's injuries and opinions "about what events and medical conditions can or cannot cause such injuries" permissibly addressed matters beyond common knowledge, Roberts argues, "[w]hat was not permissible—because it was not beyond the jury's common knowledge—was for Dr. Hunter to go a step further and draw his own conclusion about what caused Buckner's death . . . . Jurors were fully capable of taking the description of the injuries, and Dr. Hunter's testimony about what events can and cannot cause such injuries, to reach their own conclusions—based on all the evidence presented—about what actually happened here." Jurors could equally well complete the implicit syllogism on which Hunter relied by drawing, on their own, the final inference at step 5: (1) people do not die without cause; (2) Buckner died; (3) an autopsy of the available parts of her body found no cause of death; (4) her head was unavailable; (5) therefore, the cause of death likely involved her head.

While this new argument is logically sound, Roberts forfeited it by not objecting to Dr. Hunter's testimony—either in limine or on the stand—on the basis that his opinion that the *cause* of death was a head injury involved applying the law to the facts in a way not beyond jurors' common knowledge. (See § 353 [party must have objected on "specific ground" raised on appeal].) Roberts objected on that basis only to Hunter's testimony that the *manner* of death was homicide (and not accident or suicide). When Hunter opined that

13

the head was the likely *site* of the fatal injury (however inflicted), Roberts objected solely on the basis that the opinion was *speculative.* On appeal, he thus raises the legal theory on which he objected at trial to *one* opinion—i.e., that it invaded the province of the jury by addressing a matter within common knowledge—and uses it to challenge a *different* opinion to which he did *not* object on that basis at trial.

This mix-and-match approach to preserving objections is invalid. If a party objects to testimony A only as hearsay, and to testimony B only as irrelevant, they may not contend on appeal that the trial court should have excluded testimony B as hearsay. (§ 353.) Nor do we have discretion to excuse such a forfeiture: Section 353 deprives appellate courts of authority to address a claim of error in admitting evidence not preserved below. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; see § 353 [a verdict "*shall not* be set aside, nor *shall* the judgment . . . based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence . . . stated as to make clear the *specific ground* of the objection or motion; and [¶] (b) The [appellate] court . . . is of the opinion that the admitted evidence should have been excluded *on the ground stated . . .*"], italics added.)

In so observing, we are mindful that we must apply section 353 in a realistic and not a formalistic manner. (*People v. Partida* (2005) 37 Cal.4th 428, 434.) But this case does not involve an informal or imprecise objection, or any other source of uncertainty as to which testimony Roberts challenged on which grounds; we are not enforcing procedural niceties. Instead, in cross-examining Dr. Hunter, Roberts's counsel clearly elicited, and emphasized the importance of, the distinction between cause of death and manner of death. Counsel's in limine arguments and in-trial objection to Hunter's respective

14

opinions on those issues were equally clear and distinct in their bases. Roberts's argument that Hunter's testimony invaded the province of the jury was clearly limited to his opinion that the *manner* of death was homicidal violence. (See p. 9, *ante* ["My core problem with it is the word 'homicide' because I think that that is a jury determination"].) Roberts never gave the trial court a chance to assess whether Hunter's opinion that the *cause* of death involved a head injury entailed an inference that jurors were just as capable of drawing. (See *Partida*, at p. 435 ["A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct"].) Roberts's lone objection to the opinion about cause of death was instead that it was *speculative*, i.e., that it involved an inference *no one* could permissibly draw.

## II.

### *Any Error in Admitting the Opinion Was Harmless*

Even were we to consider Roberts's forfeited argument and find error— i.e., conclude that the jury could infer just as easily as Dr. Hunter that the locus of the fatal injury was likely Buckner's head—, it would not matter, for Roberts has not borne his burden of showing that any such nonconstitutional error was prejudicial. (See *People v. Vance* (2023) 94 Cal.App.5th 706, 717 [under prejudice standard for state law errors, defendant bears burden of persuasion on issue of prejudice], citing *People v. Penunuri* (2018) 5 Cal.5th 126, 169.[8]) As set forth below, it is not reasonably probable that it affected

---

[8] Errors in applying state evidentiary law are subject to the prejudice test enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which requires a defendant to demonstrate a reasonable probability that the error affected the outcome of the trial, except in rare cases in which the error prevented a defendant from presenting a defense or otherwise "rendered the trial 'so arbitrary and fundamentally unfair' that it violated federal due process" (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20; see *People v.*

the outcome of the trial to let Dr. Hunter testify that "I suspect or I believe that there were likely injuries to the head [¶] . . . [¶] because I'm not seeing lethal injuries to the torso and I'm not seeing lethal injuries to the extremities, [which] leads me to believe that there were injuries . . . to the head and neck area, the part of her that I don't have to look at." (See *Watson, supra,* 46 Cal.2d at p. 836 [reasonable probability standard]; *People v. Prieto* (2003) 30 Cal.4th 226, 247 [applying *Watson* standard to erroneous admission of expert testimony].)

As the Attorney General notes, insofar as Roberts's defense relied on the possibility that the fatal injury might have been inflicted not homicidally but suicidally (given Buckner's history of suicide attempts) or accidentally, the fact that the *site* of the injury was her head in no way alters that possibility: she could have accidentally fallen and hit her head, committed suicide by shooting herself in the head, or been murdered by strangulation or a blow to the head. Even assuming arguendo that Dr. Hunter's opinion should have been stricken, and that it did lead jurors to assume that the cause of death was a head injury, Roberts thus fails to show how this could have *directly* and prejudicially affected their analysis of whether the injury arose homicidally, suicidally, or accidentally. Insofar as Roberts's concern at trial was, as his counsel put it, to preserve jurors' ability to envision "a universe [in which] she was not killed, but she was dismembered," Hunter's

---

*Boyette* (2002) 29 Cal.4th 381, 427–428), in which case we apply the prejudice test for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, which places the burden on the State to establish beyond a reasonable doubt that the error was harmless. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) Roberts conclusorily asserts that the error here was so extreme as to deny his federal constitutional right to due process, but his assertion rests on no authority and is not persuasive.

opinion that the *cause* of her death was a head injury in no way foreclosed that universe.

In reply, Roberts does not try to rebut that point. Instead, he offers just one theory of how, if Dr. Hunter's testimony led jurors to infer that the *cause* of death was a head injury, that inference could *indirectly* have made them more likely to find that the *manner* of death was homicide, not suicide or accident. In the prosecutor's initial closing statement, Roberts notes, she invoked Hunter's opinion about a head injury to argue that, when Roberts decapitated the body, one of his goals was to conceal evidence of the way in which he had killed Buckner. For context, we quote the prosecutor's comments, and an admonition by the court, at some length:

"If you have any doubt that this case is a murder case, look at [Buckner]'s body during the autopsy. That is the body of a murder victim, the way that the defendant dismembered her, the way that he cut into her body. . . . [¶] . . . [¶] [H]e got rid of [Buckner]'s head, her hands, and her feet. *He did that, sawing off each of those body parts, to hide the manner in which he killed her* and to try to get away with her murder. [¶] Dr. Hunter told you that basically he was missing the most vital part of [Buckner]'s body in order to complete a full examination. He couldn't [evaluate] if she was strangled because her body was dismembered to her shoulders. There was no signs of trauma to her neck. Her hyoid bone [which could show strangulation] was missing. Her head was missing that would show the petechiae in her eyes if that's how she died, by strangulation. . . . [H]e wasn't able to evaluate blunt trauma to her head to see if that was the manner and the cause of her death. [¶] . . . [¶] Dr. Hunter told you that the likely cause of death for [Buckner] was trauma to her head or her neck. [¶] [Defense counsel]: Objection, . . . facts not in evidence. [¶] [The Court (to the jury)]: . . . [T]he lawyers are

17

going to tell you what their interpretation of the testimony was, what they believe the facts show. You are to make those determinations yourself. To the extent that the lawyers' recitation of the facts are not supported by your findings of what those facts are, you are to disregard the lawyers' comments and go by your own conclusions. . . . [¶] [Prosecutor]: [Roberts] dismembered [Buckner]'s body after he murdered her, and you have significant evidence to show that he did this. He . . . dismembered [Buckner] . . . hiding her identity, *hiding the manner in which he killed her*." (Italics added.) In her rebuttal, the prosecutor said that Roberts was "not entitled to an acquittal because he successfully discarded a vital part of . . . Buckner's body such that a trained pathologist could not determine her cause of death."

Roberts's theory of prejudice is thus that it is reasonably probable that Hunter's opinion about a head injury, coupled with the prosecutor's comment about Roberts hiding the way in which he killed Buckner, affected the verdict. (*Watson, supra*, 46 Cal.2d at p. 836.) If Hunter's opinion led jurors to assume a fatal head injury—and if they also assumed that the injury was identifiably homicidal—then they could have found that, when Roberts decapitated the body, he sought not only to prevent its identification (and thus to prevent discovery of the fact that Buckner was dead) but also to prevent discovery of the homicidal injury he knew he had inflicted.[9]

The premise of Roberts's theory is that "While the physical evidence suggests that [he] dismembered and hid Buckner's body, it does not explain

---

[9] The other obvious (and not mutually exclusive) explanation for the act of removing Buckner's head—i.e., to prevent identification of her body and thus discovery of the fact that she was dead—also tends to show consciousness of guilt. But it does not do so in a way to which Dr. Hunter's opinion about a head injury is relevant. Removing the head *for the purpose of preventing identification* tends to show consciousness of guilt in the same way regardless of whether the fatal injury was to the head or elsewhere.

18

how she died or establish that he killed her." This implies that the jury could have had a reasonable doubt about his guilt based on the possibility that Buckner died by suicide or accident, and that Roberts, presumably out of fear that he would be accused of killing her, reacted by dismembering Buckner's body to conceal her death. From this perspective, if jurors accepted Dr. Hunter's opinion about a head injury, that would make it harder for them to view Roberts's act of removing and concealing the head as reflecting *solely* a fear of false accusation. If Buckner died from a head injury, Roberts would have been hiding not just the fact of her death, but, in the prosecutor's words, "the manner in which he killed her." Roberts's conduct could thus support an inference not only that he wished to hide the fact that Buckner had died, but also that he knew that Buckner's head showed that her manner of death had not been suicide or accident, but homicide—and that he wished to hide *that* fact.

While that theory of prejudice is logically possible, it does not show a reasonable probability that the admission of Dr. Hunter's opinion affected the outcome of the trial. (*Watson, supra*, 46 Cal.2d at p. 836.) Jurors conceivably could have entertained a reasonable doubt of Roberts's guilt on the theory that Buckner could have died by accident or suicide, and Roberts could have dismembered and hid her body out of fear of false accusation (the "innocent dismemberment" theory), but the prospect is extremely unlikely.

Moreover, Roberts's claim of prejudice depends not only on the dubious proposition that the jury *would have been open to acquittal* on the innocent dismemberment theory, but the further proposition that Dr. Hunter's opinion is what tipped the scale to conviction. That is also unlikely. Hunter merely drew an obvious inference that the jury was equally capable of drawing on its own—namely, that because an autopsy of the torso and limbs found no cause

19

of death, the cause of death likely involved the head.  While drawing that conclusion should have been the responsibility of the jury (*People v. Sergill* (1982) 138 Cal.App.3d 34, 40 ["Whenever feasible 'concluding' should be left to the jury"]), the likelihood that they would *not* have drawn it on their own—and that Hunter's opinion thus affected the outcome of the trial—is slim. Hunter did not state his view in authoritative, complex, or scientific terms that might have led jurors to defer to his expertise without analyzing the issue for themselves:  He acknowledged he could not exclude the possibility that Buckner died by accident or suicide—including by slitting her wrists—and he said, "I don't specifically have a reason why she died."  He was transparent about the fact that his expertise gave him no special basis for inferring that the cause of death was a head injury.

The implausibility of Roberts's theory is even clearer when viewed in light of the overwhelming evidence of his guilt.  As set forth above, Buckner's friends, family, and neighbors testified consistently to his isolation, control, and verbal abuse of her, and to the repeated injuries she attributed to him, which led her to tell a friend that he was going to kill her.  (See p. 2, *ante*.) Forensic evidence showed that Roberts dismembered her body in their bathroom and executed a handwritten "to-do" list of steps to remove evidence of the act, yet left behind a sawed fragment of her bone, and that he disposed of her body in a plastic bag after researching how to do so without detection, yet left behind genetic material on duct tape securing the bag.  (See pp. 2–3, *ante*.)  A note on Buckner's phone, which Roberts had kept, read, "body-head-limbs, get rid of tattoo." (See pp. 4–5, *ante*.)  And when interrogated, Roberts claimed to have been unaware of Buckner's death and suggested that "debt collectors" had killed her or she had killed herself.  (See p. 4, *ante*.)

In sum, Roberts's claim is forfeited and shows no reasonable probability of an error that affected the verdict. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## III.

### *The Abstract of Judgment Must Be Corrected*

Roberts contends, and the Attorney General concedes, that the abstract of judgment should be amended to reflect 301 rather than 300 days of presentence custody credit. We agree.

## DISPOSITION

The judgment is affirmed. On remand, the abstract of judgment must be amended to show that Roberts is entitled to 301 actual days of presentence custody credit, rather than 300 days. The trial court is directed to amend the abstract of judgment accordingly and to send a copy of the amended abstract to the Department of Corrections and Rehabilitation.

_____
LANGHORNE WILSON, J.

WE CONCUR:

_____
BANKE, Acting P. J.

_____
SMILEY, J.

*People v. Roberts / A171091*

21